*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

2 CROOKED CREEK LLC,

      Plaintiff/Counterdefendant-Appellant,

v

JIM L. FRYE and SHORELINE DEVELOPMENT
COMPANY, INC.,

      Defendants/Counterplaintiffs-
      Appellees.

UNPUBLISHED
March 12, 2020

No. 341274
Cass Circuit Court
LC No. 16-000392-CZ

Before: MURRAY, C.J., and METER and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff/Counter-Defendant-Appellant 2 Crooked Creek (plaintiff) filed a delayed application for leave to appeal the stipulated order of dismissal and the underlying decision granting summary disposition in favor of defendants and denying plaintiff's motion for reconsideration. This Court denied the application.[1] On March 5, 2019, our Supreme Court issued an order remanding the case to this Court "for consideration as on leave granted."[2] Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

This action for breach of contract, negligence, and abuse of process arises from the construction of a home. During the construction, plaintiff failed to pay the property taxes, and the county foreclosed on the property. Plaintiff filed suit against defendants Shoreline Development Company, Inc. (construction company "Shoreline") and Jim L. Frye (company representative and

---

[1] *2 Crooked Creek, LLC v Frye*, unpublished order of the Court of Appeals, entered June 4, 2018 (Docket No. 341274).

[2] *2 Crooked Creek, LLC v Frye*, 503 Mich 952 (2019).

guarantor), the parties responsible for construction of the home, asserting that defendants' removal of the notice of foreclosure posted on the home prevented plaintiff from learning of the foreclosure and paying the taxes. However, the trial court granted defendants' motion for summary disposition and denied plaintiff's motion to adjourn to permit additional discovery. Plaintiff's motion for reconsideration was also denied. From these rulings, plaintiff appeals.

However, the subject matter of this dispute, the foreclosure of the home located at 61320 Crooked Creek Road, Cassopolis, Michigan, was the subject of two prior appeals before this Court, challenging the county's foreclosure of the property.

## II. FIRST APPEAL – COUNTY FORECLOSURE CHALLENGE

In *In re Petition of Cass Co Treasurer for Foreclosure*, unpublished opinion per curiam of the Court of Appeals, issued March 8, 2016 (Docket No. 324519), this Court set forth the following statement of facts:

> In July 2010, 2CC, an Indiana limited liability company, purchased property in Penn Township, Cass County, Michigan. A real estate agreement effectuating that sale identified 2CC's address as: 36 Bradford Lane, Chicago, Illinois 60523. The real estate agreement was signed by Sergei Antipov as manager of Kava Management Company, LLC, which itself was the manager of 2CC. Antipov later attested that he lived at 36 Bradford Lane, Oak Brook, Illinois 60523, until June 15, 2011.

> On July 20, 2010, the Cass County Register of Deeds recorded a deed. The deed listed 2CC's address as "36 Bradford Lane, Chicago, IL 60523," and indicated that tax bills should be sent to "2 Crooked Creek LLC" at that address. It thus reflected the same street address as had the real estate agreement, again incorrectly identifying that street address as located in "Chicago," rather than in "Oak Brook."

> Property taxes were not paid for the property for 2011. In 2013, petitioner initiated forfeiture and foreclosure proceedings on the property pursuant to the General Property Tax Act ("GPTA"), MCL 211.78 et seq. On January 14, 2013, Title Check, LLC (Title Check), acting as petitioner's agent, sent a notice of forfeiture regarding 2011 real property taxes for the property in question, as required by MCL 211.78f. The January 14, 2013 notice letter was sent by certified mail, return receipt requested, to 36 Bradford Lane, Chicago, IL 60523 (the address identified in the deed for the receipt of tax bills). Because 60523 is actually the zip code for Oak Brook, not Chicago, notice of the letter was delivered on January 16, 2013, to 36 Bradford Lane, Oak Brook, IL 60523. The letter was left unclaimed, and on February 15 the letter was returned to Title Check marked "Unclaimed— Unable to Forward."

> On April 9, 2013, petitioner prepared a certificate of forfeiture as required by MCL 211.78g, and recorded it with the Cass County Register of Deeds on April 12, 2013. On May 5, 2013, Title Check sent a notice of inspection via regular first class mail addressed to 2 Crooked Creek at 36 Bradford Ln, Oak Brook IL 60523.

The letter identified the property and stated that because of unpaid 2011 taxes, the property would be subject to inspection and posting of notice on June 17, 2013. The letter also stated that the property was in the process of foreclosure, and that anyone with an interest in the property should immediately contact petitioner.

Title Check performed a title search of the property, which was completed on June 3, 2013. Petitioner represented in its brief before the trial court that the title search was initiated on or before May 1. The title search revealed that the only recorded interests in the property were the deed and real estate agreement, an easement in favor of Indiana Michigan Power Company, and the certificate of forfeiture.

On May 28, 2013, KAVA Holdings, LCC, an Alaska limited liability company, of which 2CC is a wholly owned subsidiary, and RFA [Russian Ferro Alloys, Inc.], an Indiana corporation, entered into a mortgage agreement regarding the property, in the amount of $3,500,000. The mortgage agreement was subsequently recorded with the Cass County Register of Deeds on July 10, 2013.

On June 5, 2013, petitioner filed a petition for foreclosure which sought to foreclose (for unpaid taxes) on approximately 579 separate parcels of real property described in Schedule A of the petition pursuant to MCL 211.78h(1), including the property owned by 2CC. The trial court scheduled a hearing on the petition for February 18, 2014.

On June 18, 2013, Katelin Makay, a land examiner working for Title Check, visited the property and determined that the property appeared to be occupied. She was unable to personally meet with any occupant, however, so she posted on the property, in a conspicuous manner, a notice of show cause hearing and judicial foreclosure hearing. Makay posted the notice in a window next to a double door of the house on the property, took a photograph of the posted notice, and attached that photograph to her inspection worksheet.

James Frye, president of Shoreline Development Company, attested that he was at the property on or shortly after June 18, 2013, because his company was building a house there for 2CC. He saw the notice of the show cause hearing and the judicial foreclosure hearing on a window next to the front door of the house, and he then directly contacted "a representative of 2 Crooked Creek, LLC by telephone and advised them of the posted notice and was advised by the representative of 2 Crooked Creek, LLC that the matter would be taken care of." Randy Bennett, principal of Bennett Painting, and Ed Lijewski, superintendent for Shoreline Development Company, both attested that they also were at the property on or shortly after June 18, 2013, saw the posted notice, and were present when Frye contacted a representative of 2CC about the notice.

However, Antipov stated in an affidavit that he and Douglas Anderson were the only representatives of 2CC, that Frye knew they were the only representatives of 2CC, and that Frye did not tell him at any time of any notice posted on the

-3-

property. Anderson stated in an affidavit that he is the registered agent for 2CC, and that he regularly spoke with Frye, but that Frye at no time informed him of the notice posted on the property.

On August 20, 2013, Title Check sent a notice letter via first class mail of the show cause hearing and the judicial foreclosure hearing to 2CC at the 36 Bradford Lane address in Oak Brook. Title Check sent another notice letter via first class mail to the same address on October 30, 2013, which also indicated that notice of foreclosure would be published between December 2013 and February 2014.

On December 6, 2013, a notice of show cause hearing and judicial foreclosure hearing was sent via certified mail to 2CC at 36 Bradford Lane, Oak Brook, IL 60523. The December 6, 2013 notice letter, sent pursuant to MCL 211.78i(7), included the date the property was forfeited to petitioner, a statement that 2CC could lose its interest in the property as a result of the foreclosure, a legal description, parcel number, and street address of the property, the person to whom the notice is addressed, the total amount to redeem the property as of March 1, 2013 ($14,743.24), the date and time of the show cause hearing (January 15, 2014), the date and time of the foreclosure hearing (February 18, 2014), and a statement that unless the forfeited delinquent taxes, penalties, interest and fees were paid on or before March 31, 2014, 2CC would lose its interest in the property and title to the property would absolutely vest with petitioner. Martin J. Spaulding, general manager of Title Check, stated in an affidavit that the December 6, 2013 notice letter was returned to Title Check on January 14, 2014 marked "Refused—Unable to Forward." On December 20, 2013, a copy of that same notice letter was sent via first class mail to 2CC at the same address.

On December 19, 2013, December 26, 2013, and January 2, 2014, a notice of show cause hearing and judicial foreclosure hearing was published in the Cassopolis Vigilant, a weekly newspaper circulated, printed, and published in Cass County, Michigan. The notice contained a list of properties subject to foreclosure, and indicated that 2CC owed $14,743.24 as of March 1, 2013, for the subject property, identified by parcel number. The notice also included the dates of the show cause hearing and the judicial foreclosure hearing, and indicated that title to the property would vest absolutely in the foreclosing governmental unit if the delinquent payments were not paid by March 31, 2014.

The show cause hearing took place in January 2014. The record does not indicate who did or did not appear at the hearing, but suggests that no one appeared on behalf of 2CC.

On February 18, 2014, the hearing on the petition for foreclosure was held as scheduled, at which no one appeared on behalf of 2CC to contest the foreclosure. The trial court made the following findings of fact:

1. that as required by MCL 211.78k(5)(f) all persons entitled to notice and an opportunity to be heard have been provided that notice and opportunity and have been afforded due process as required by MCL 211.78(2).

2. that the County Treasurer of the County of Cass or her Agents have complied with the procedures for provision of notice by mail, for visits to forfeited property, and for publication as found in MCL 211.78i, and

3. that each person entitled to notice was provided proper notice or if not so notified either:

(i) had constructive notice of the hearing under this section by acquiring an interest in the property after the date of the notice of forfeiture was recorded under MCL 211.78g.

(ii) appeared at the hearing or filed written objections with the clerk of the circuit court prior to the hearing or

(iii) prior to the hearing had actual notice of the hearing.

The trial court ordered that a judgment of foreclosure be entered based on forfeited unpaid delinquent taxes, interest, penalties, and fees for each of the listed properties, including the property owned by 2CC. The trial court further stated that fee simple title to the foreclosed property would vest absolutely in Cass County, with no further right of redemption, if the delinquent balance was not paid on or before March 31, 2014.

Anderson stated in his affidavit that he first learned of the judgment of foreclosure on April 18, 2014, when he received a telephone call from Spaulding on behalf of Title Check, in which Spaulding asked him about the forfeiture and foreclosure and inquired whether Anderson would be attending the auction for the property. Anderson further stated that the telephone number at which Spaulding called him is not a listed number, yet Spaulding was able to obtain it from some source, and that Spaulding could have called him prior to March 31, 2014, when the foreclosure became final. Anderson stated that he did not receive any notices of tax assessments, the certificate of foreclosure, the show cause hearing, or the foreclosure action on the property. Antipov also stated in his affidavit that he did not receive any notices of tax assessments, the certificate of foreclosure, the show cause hearing, or the foreclosure action, and that he first learned of the judgment of foreclosure when Anderson advised him of the telephone call from Spaulding.

On July 3, 2014, respondents moved the trial court to set aside the judgment of foreclosure. They claimed that they did not receive constitutionally sufficient notice of the foreclosure proceedings, such that they were deprived of their property interests without due process of law. Specifically, respondents argued that petitioner knew that the 36 Bradford Lane address was not an address to which it

-5-

could send a notice that was reasonably calculated to inform 2CC of the pending foreclosure. According to respondents, petitioner did not make reasonable efforts to determine an address reasonably calculated to provide 2CC with notice, and did not perform a business records search as required by statute. Furthermore, the mortgage agreement with RFA recorded on July 10, 2013, contained correct addresses for respondents, and if notice had been sent to those addresses respondents would have received notice of the foreclosure action. Finally, respondents argued that the deprivation of respondents' due process rights was particularly egregious because Title Check had actual knowledge of how to contact 2CC, as evidenced by the telephone call made by Spaulding to Anderson shortly after the foreclosure became final.

> The trial court denied respondents' motion, finding that petitioner met the initial statutory notice requirements under MCL 211.78i, and that petitioner had no reason to believe notice was insufficient. The trial court held that petitioner had no statutory duty to search Indiana business records for 2CC's address. The trial court found that due process requirements were met by petitioner because petitioner sent certified mail to the address listed in the deed, sent several first class letters to that address, posted notice on the property, and published notice in a newspaper. The trial court found that taken together, those actions reflected efforts reasonably calculated to inform interested parties and complied with both statutory and case authority, and noted that the presence of actual notice is not a deciding factor in the analysis. Regarding RFA, the trial court found that because the mortgage had not yet been recorded when petitioner performed its title check, and because the certificate of foreclosure was recorded before the mortgage, petitioner had no duty to provide RFA with any additional notice of the foreclosure. [Unpub op at 2-6.]

Plaintiff and RFA then appealed to this Court by leave granted. This Court affirmed the trial court's conclusion that the Cass County Treasurer provided notice in a manner that protected respondents' due process rights and, therefore, affirmed the trial judge's denial of the motion to set aside the judgment of foreclosure. Unpub op at 6-9. Our Supreme Court denied leave to appeal, *In re Cass Co Treasurer for Foreclosure*, 500 Mich 882 (2016), and reconsideration, *In re Cass Co Treasurer for Foreclosure*, 500 Mich 984 (2017).

## III. SECOND APPEAL – APPEAL FROM FORECLOSURE

Plaintiff and RFA also filed an action challenging the notice provided by the foreclosing governmental entity and requested monetary damages before the Court of Claims. The Court of Claims presided over a bench trial, and following testimony, it dismissed the action pursuant to MCR 2.504. This Court affirmed in *2 Crooked Creek, LLC v Cass Co Treasurer*, ___ Mich App ___; ___ NW2d ___ (2019) (Docket No. 342797), lv pending. In that decision, this Court delineated the following summation of the trial testimony and the Court of Claim's ruling:

> Around the same time that plaintiffs filed their motion to set aside the judgment in Cass Circuit Court, plaintiffs initiated the instant litigation in the Court of Claims. The trial court issued a stay pending resolution of this Court's Docket No. 324519.

At trial, Spaulding, general manager of Title Check, testified that Title Check used first class mail to test addresses "to see if we can find any bad addresses. If we find bad addresses or get information indicating that a parcel is—that the mail piece has been forwarded, we can incorporate those addresses into our system." Spaulding conceded that as of February 15, 2013, his office had notice that the mail was unable to be forwarded and was unclaimed. Spaulding agreed that the notice of show cause hearing and notice of foreclosure hearing were sent by certified mail to the Oak Brook address and returned "refused," but that was not an indication of a bad address. He agreed that 2CC did not receive notice of the show cause by the certified letter, but noted that Title Check sent the same notice to the address by first-class mail at the same time and that letter was not returned. He testified that it was "not uncommon with certified mail" and that "unable to be forwarded" did "not necessarily indicate that address is by any means bad. It means there's no address forwarding order on file for anybody theoretically that has moved from that address." Spaulding indicated that there was no statutory requirement for locating another address and re-sending the notice when the notice came back returned and, in any case, he was not sure what purpose it would serve "because as far as we knew, this was a good address. It was simply unclaimed. There's no indication that they're not at this address so we had no reason to believe it was not a good address. It's very common for mail to be unclaimed."

Spaulding conceded that he wrote in an email after the foreclosure his "hunch" that "they may not be getting mail from the address for some reason." Spaulding was responding to an email from defendant indicating that plaintiffs were at the county getting estimates and permits and defendant wanted to let them know they did not own the property anymore. After reviewing the file, it appeared to Spaulding that plaintiffs were not "acknowledging" their mail; he conceded that the email said "getting," and noted that "[i]n a perfect world maybe I would have phrased it as acknowledge." Spaulding also testified that not "getting" mail can include someone bringing it into the house and not giving it to the intended recipient, not that it's a bad address. Spaulding testified that the duty to follow up on an address would be triggered if the mail said something like "not at this address, forward order expired, [or] deceased," that the final letter came back refused did not indicate it was a bad address—it could have been a good address and they just refused. He testified that on notification from the post office that the address was Oak Brook and not Chicago, they had adjusted that in their records. He indicated that any mail that got returned to their office was placed in the file and that none of the first-class mail was returned.

Spaulding testified that Title Check searched through the Michigan Business Entity index to determine an address or registered agent for 2CC even though the title in this case indicated that the property was held by an Indiana company. He testified that state departments change names regularly and that a reference in MCL 211.78i(2)(d) to the Department of Labor and Economic Growth, (which no longer exists in Michigan as it is now known as the Department of Licensing and Regulatory Affairs (LARA)), was an indication to check the Michigan Business Entity index. The trial court ruled sua sponte that "Department

-7-

of Labor and Economic Growth" meant Michigan and did not mean to check other states. Spaulding testified that an Indiana company would only show up in LARA's records if it had a Michigan agent; otherwise it would be unregistered.

Spaulding stated that Title Check always erred on the side of posting the notice at a property to "remove the argument about the fact that I was camping there but my tent was not there that day." He further testified that, in addition to the site visit by Katelin Makay, publication occurred on December 19 and 26, 2013 and January 2, 2014.

Antipov testified that he lived at 50 Baybrook, Oak Brook, IL 60523 and had been there since August 2011. He had previously lived at 36 Bradford in Oak Brook for two years, leasing it while he built his house at 50 Baybrook. He clarified that it could have been June 2011, but that his lease ran out in August 2011, and he was moving things to the new house in the process. After moving from 36 Bradford, Antipov had arranged with the post office to forward his mail and that was supposed to last 12 months. Defendant's counsel attempted to impeach Antipov with evidence of Illinois car titles listing the 36 Bradford address; there was a dispute over whether the documents also evidenced registration. Antipov testified that he used the Baybrook address for any cars he purchased after his move.

Antipov testified that he never received any tax bills, notices about unpaid taxes, notice of a certificate of forfeiture, the notice with the inspection deadline, the letter notifying 2CC about publication deadlines, the notice of show cause hearing and judicial foreclosure, or the judgment of foreclosure. He testified that he had never seen the certificate of foreclosure of real property before and neither he, nor anyone on behalf of 2CC, received it; if they had, he would have paid the funds due. He testified that had the notice of the certificate of foreclosure reached him, he would have paid the taxes because what was due was "nothing compared to the value of the property," and he noted that he did remit the funds when he found out about it, but the check was returned as unaccepted. Antipov stated that he always claimed his certified mail, never refused it, and implied that if any notice had been delivered to him by certified mail, he would have accepted or claimed it.

Antipov testified that he learned of the foreclosure in mid-April 2014 when Anderson called him. Prior to that time, he had no notice, whatsoever, that the property was in danger of foreclosure. However, he admitted that he never updated his address with defendant for the property he owned in Michigan because he "didn't think that there was anything being issued to me to begin with. [He] was waiting for the occupancy certificate." Antipov testified that he did not think he would get a tax bill until an occupant moved into the property.

Antipov was the owner and manager of KAVA Management, LLC, which itself is the manager of 2CC. He testified that Anderson became the registered agent for 2CC sometime in 2011 or 2012 and the address for 2CC was changed to Mishawaka, Indiana. Antipov signed the July 2013 mortgage on behalf of KAVA Holdings, LLC and Kava Management for 2CC, and the address for KAVA

provided in the mortgage was 50 Baybrook. The property was purchased vacant, and 2CC was to manage the building of a house on the property. Antipov opined that the $3.5 million mortgage represented the value of the house and the property itself. There was a general contractor on site and Antipov believed that the contractor was interacting with the township throughout the building process. Antipov testified that, in June 2013, the house was not finished and there was no certificate of occupancy, but it was close to the end.

Anderson, the current president of RFA, testified that he never received notice of tax delinquency or deficiency with respect to RFA's mortgage. He conceded that nothing in the first paragraph of the mortgage mentioned 2CC. The money from the loan reflected in the mortgage was used to purchase a different property by a different subsidiary of KAVA; none of the money went to 2CC. He did not know whether an expert was going to testify that the foreclosed property was worth $1.65 million, but he believed it was worth more than that because they paid $820,000 for the land and almost $2.6 million for the house that was built. Anderson admitted that he did not do a title search before drafting and filing the mortgage, and the Board of Licensing was not consulted before the mortgage was recorded. Anderson agreed that the certificate of forfeiture had been recorded on April 12, 2013 and that if RFA, 2CC, or anyone else had done a title search, they would have known about the county's interest in the property for unpaid taxes.

Defendant moved for a directed verdict, arguing that it had shown that it provided proper notice and that 2CC received the notice required by statute and that RFA was not entitled to notice. After requesting briefing, the trial court then issued its opinion and order on defendant's motion for directed verdict and, construing it "as a motion for involuntary dismissal under MCR 2.504(B)(2) in this bench trial," granted the motion. In its opinion, the trial court noted that "the issue of whether plaintiff received due process has already been fully litigated. The issue here, as discussed infra, is for monetary damages based on whether plaintiff received any notice required under the act." It noted that plaintiffs brought their action under MCL 211.78l of the GPTA, "which creates a cause of action in this Court for property owners who allege that they did not receive any notice under the GPTA." The opinion recognized that " 'statutory notice rights can be violated, giving rise to an action for money damages, yet minimum due process may have been satisfied.' " Thus, the court concluded that plaintiffs had to establish that they did not receive any notice, notwithstanding the fact that the foreclosing governmental unit satisfied minimum due process requirements.

The trial court then noted:

By and large, plaintiffs' briefing in this case contends that defendant should have taken additional efforts to locate 2 Crooked Creek's address in light of the fact that the certified mailings were returned. They also argue, without citing any pertinent authority, that defendant should have continually checked the county register of deeds, thereby discovering the later-recorded mortgage with RFA, and

-9-

thereafter should have known they needed to provide notice to RFA. They also contend that they never received any of the notices required under the GPTA.

> The trial court determined that RFA was not entitled to notice under the GPTA. It further held that 2CC was not entitled to relief on the facts presented. It indicated that an additional reason to grant defendant's motion was that 2CC had failed to present any evidence of its damages because there was no testimony establishing the fair market value of 2CC's interest in the property at the time of the foreclosure. It noted that there was testimony about what was paid for the property and about the loan, but no testimony regarding 2CC's interest in the property at the time of the foreclosure as that interest had been affected by the note and mortgage held by RFA. [Slip op 6-9.]

Ultimately, this Court concluded that the notice provisions of MCL 211.78*l* were satisfied and that plaintiff and RFA were not entitled to monetary damages from the county. *Id*. at 10-18.

### IV. THIRD APPEAL – THIS LAWSUIT AGAINST CONTRACTOR

Unable to obtain relief from the tax foreclosure, plaintiff filed suit against defendants, Shoreline and its resident agent Frye. Plaintiff alleged that it entered into a residential home construction agreement on March 3, 2011, that provided defendants were to construct a home on the site with a completion date of June 3, 2012. Further, it was asserted that a notice of show cause and tax foreclosure was affixed to the partially completed home on June 18, 2013. However, defendant Frye allegedly removed the notice and failed to notify plaintiff's representatives of the foreclosure. Additionally, the notices were not received by plaintiff because of an incorrect address. Plaintiff also asserted that defendants knew that plaintiff would lose the property, yet they filed false affidavits for the county to facilitate the foreclosure proceeding. It claimed that if defendants had completed the project on time, there would have been a resident in the home to receive the notice. Plaintiff alleged three claims arose from these facts: (1) breach of contract (failure of performance – for Frye's failure to notify plaintiff of the foreclosure notice posted at the site); (2) breach of contract (failure to indemnify – for failing to indemnify plaintiff for the expenses incurred in its lawsuits to recover the property); and (3) negligence (for breach of duty for failing to report the foreclosure notice). Later, plaintiff filed an amended complaint that added a fourth count for abuse of process, purportedly arising from the allegedly false affidavits filed in the underlying foreclosure litigation.

Defendants filed an answer, counterclaim, and notice of nonparties at fault. Defendants alleged that plaintiff failed to allow them to complete the work and failed to pay for the work, resulting in a loss of approximately $80,000. With regard to the nonparties at fault, defendants alleged that the principal of plaintiff, Sergei Antipov, his assistant Michael Heston, and company representatives Douglas D. Anderson and Jeff Helman failed to notify the county of a change in mailing address from the deed and failed to make inquiry of the county regarding nonreceipt of a tax bill. Therefore, these acts of negligence were the proximate cause of any injury.

-10-

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10).[3]  It was alleged that the abuse of process claim failed because, assuming the affidavits were false, the affidavits were not the proximate cause of any damages because the trial court and this Court did not rely on those affidavits when affirming the foreclosure.  Further, defendants claimed no duty was owed, as a matter of law, to notify plaintiff of a posting at plaintiff's property, the need to pay property taxes, and of scheduled court hearings.  The contractual duty to indemnify only pertained to the construction project and did not include indemnification for other litigation.  Plaintiff had three different representatives (Antipov, Anderson, and Helman) to receive notices, and therefore, defendants did not act as an agent that was required to provide notice.  Because there was a governing contract, the negligence claim failed.  With the pleadings, defendants submitted an excerpt from their brief in opposition to plaintiff's motion to amend its complaint to add the abuse of process claim.  Although defendants did not attach other documentary evidence to the motion, they cited to documentary evidence in the file, including the contract, deposition testimony, and the prior appellate decisions rendered by this Court.

Plaintiff filed an answer to the motion for summary disposition.  It alleged that summary disposition of all four counts was inappropriate.  Specifically, plaintiff asserted that summary disposition of the breach of contract claims should be denied because it had presented documentation indicating that defendants had breached their contractual obligations by failing to complete construction by June 3, 2012, by removing the legal notice from the home under construction and then failing to provide plaintiff with the notice, and by refusing to indemnify plaintiff for the loss of the property to tax foreclosure as well as the legal costs incurred challenging the foreclosure.  With regard to the negligence claim, plaintiff submitted that defendants owed a duty, independent of any contractual duty, as a general contractor and a member of the general public, to not remove the foreclosure notice without notifying plaintiff.  Plaintiff claimed that a representative of defendant Shoreline acknowledged that defendants breached this duty, and therefore, deprived plaintiff of the opportunity to cure the tax deficiency and prevent the foreclosure.  Finally, plaintiff claimed that defendants had engaged in an abuse of process by removing the notice and procuring false affidavits.  Even if the false affidavits were not relied upon in the prior litigation, plaintiff asserted that it could still establish an abuse of process because plaintiff suffered compensable harm in the form of time and money expended to address and counter the false affidavits.  Furthermore, plaintiff alleged that the loss of the home and property was proximately caused by defendants' removal of the notice, which deprived plaintiff of the opportunity to prevent the foreclosure.  The trial court granted defendants' motion for summary disposition and also denied plaintiff's motion for reconsideration.

V.  SUMMARY DISPOSITION

A. DOCUMENTARY EVIDENCE

---

[3] Alternatively, defendants requested a protective order extending the time to answer discovery. In light of the trial court's summary disposition decision, it did not rule on this request, and it is not raised on appeal.

-11-

First, plaintiff alleges that the trial court erred by granting summary disposition because defendants failed to support their dispositive motion with admissible evidence. We disagree.

The moving party has the initial burden to support its claim for summary disposition by affidavits, depositions, admissions or other documentary evidence. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The burden then shifts to the nonmoving party to demonstrate a genuine issue of disputed fact exists for trial. *Id*. The nonmoving party may not rely on mere allegations or denials in the pleadings. *Id*. Affidavits, depositions, and documentary evidence offered in support of, and in opposition to, a dispositive motion shall be considered only to the extent that the content or substance would be admissible as evidence. *Maiden v Rozwood*, 461 Mich 109, 120-121; 597 NW2d 817 (1999).

Affidavits, depositions, admissions, or other documentary evidence "are required" when judgment is sought based on MCR 2.116(C)(10). MCR 2.116(G)(3)(b). "The affidavits, together with the pleadings, depositions, admissions, and documentary evidence *then filed in the action* or submitted by the parties, must be considered by the court when the motion is based on subrule (C)(1)-(7) or (10). Only the pleadings may be considered when the motion is based on subrule (C)(8) or (9)." MCR 2.116(G)(5) (Emphasis added).

Judicial notice is a substitute for proofs. *Winekoff v Pospisil*, 384 Mich 260, 268; 181 NW2d 897 (1970).

> Judicial notice is based upon very obvious reasons of convenience and expediency; and the wisdom of dispensing with proof of matters within the common knowledge of everyone has never been questioned. This is the principle upon which the doctrine of judicial notice rests; convenience and expediency, and the saving of the time trouble and expense which would be lost in establishing the ordinary way facts which do not admit of contradiction. [*Id*. quoting 1 Jones, Blue Book of Evidence (Bancroft-Whitney edition of 1913), p 509, § (104).]

A judicially noticed fact is one not subject to reasonable dispute because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." MRE 201(b)(2). Judicial notice may be taken at any stage of a proceeding whether requested or not. MRE 201(c)(e). A party may be heard regarding the propriety of taking judicial notice. MRE 201(d). "A court takes judicial notice of its own files and records." *Prawdzik v Heidema Bros, Inc*, 352 Mich 102, 112; 89 NW2d 523 (1958). When a court takes judicial notice of facts contained in its own records, the original record need not be introduced. *In re Stowe*, 162 Mich App 27, 33; 412 NW2d 655 (1987). A court may take judicial notice of its own records to supply the alleged defects that exist in the current record. *Hawkeye Casualty Co v Frisbee*, 316 Mich 540, 549; 25 NW2 521 (1947). Documents that are part of lower court records in this or other cases are within this Court's purview under principles of judicial notice, based on the one court of justice concept found in Michigan's Constitution. Const 1963, art 6, § 1; *People v Snow*, 386 Mich 586, 591; 194 NW2d 314 (1972).

In light of the above cited authority, the trial court did not err in granting defendants' motion for summary disposition despite the failure to attach affidavits and deposition testimony to the motion and brief. Although the moving party must make and support entitlement to summary

disposition brought pursuant to MCR 2.116(C)(10) with admissible documentary evidence, MCR 2.116(G)(3)(b), the trial court may also consider the documentary evidence then filed in the action, MCR 2.116(G)(5), and may take judicial notice of other court records to supply any defects in the matter pending before the court, MRE 201(b)(2); *Hawkeye Casualty Co*, 316 Mich at 549.

Defendants moved for summary disposition contending that the parties' relationship was defined by the terms of the contract. The contract was for the construction of a home. Defendants claimed that the contractual duties set forth in the contract did not include a requirement that defendants apprise plaintiff of the county's taxing authority and did not require a duty of indemnification for all consequences attendant to home ownership, including tax foreclosure. Thus, it was asserted that the terms of the contract governed and demonstrated that summary disposition was proper in defendants' favor. The contract was attached to plaintiff's complaint. Accordingly, the trial court was entitled to consider the contract when deciding defendants' motion, MCR 2.116(G)(5). Additionally, the interpretation of a clear and unambiguous contract presents a question of law. *Laurel Woods Apts v Roumayah*, 274 Mich App 631, 637; 734 NW2d 217 (2007). Because defendants asserted that they were entitled to judgment as a matter of law in light of the plain language of the contract, additional documentation was unnecessary in light of their argument.

Further, defendants requested summary disposition of the negligence claim, contending that they did not owe a duty as a matter of law. A negligence action may only be pursued if a legal duty exists, requiring a defendant to conform to a particular standard of conduct for the protection of others against unreasonable risk of harm. *Chelik v Capitol Transp, LLC*, 313 Mich App 83, 89; 880 NW2d 350 (2015). The question of whether a duty exists presents a question of law reviewed de novo. *Id*. at 88. In light of defendants request for judgment as a matter of law of the breach of contract and negligence claims and their reliance on the contract that was attached to the complaint, the trial court properly addressed the merits of defendants' motion for summary disposition in accordance with the court rules and the burden of proof for dispositive motions.

Finally, with regard to the abuse of process claim, defendants asserted that the affidavits filed in the underlying foreclosure cases, even assuming they contained false content, had no bearing on the decisions in the tax foreclosure cases, and therefore, there was no foundation for the abuse of process claims. With regard to this claim, the trial judge noted that he would consider his knowledge in light of his handling of the underlying tax foreclosure suit. As noted, a court may take judicial notice of its files, and therefore, the trial judge was entitled to consider that case and the ultimate disposition by the Court of Appeals. The challenge to the documentary evidence offered in support of summary disposition fails.

## B. BREACH OF CONTRACT

Plaintiff next alleges that the trial court improperly granted summary disposition of its claims for breach of contract. We disagree.

The construction and interpretation of a clear and unambiguous contract presents a question of law for the court. *Bandit Industries, Inc v Hobbs Int'l Inc (After Remand)*, 463 Mich 504, 511; 620 NW2d 531 (2001); *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich app 486, 491; 579 NW2d 411 (1998). In *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App

684, 694; 818 NW2d 410 (2012), this Court delineated the following principles addressing contracts:

> "The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." *Mallory v Detroit*, 181 Mich App 121, 127; 449 NW2d 115 (1989). Issues regarding the proper interpretation of a contract or the legal effect of a contractual clause are reviewed de novo. *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 16-17; 718 NW2d 827 (2006). When interpreting a contract, the examining court must ascertain the intent of the parties by evaluating the language of the contract in accordance with its plain and ordinary meaning. *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). If the language of the contract is clear and unambiguous, it must be enforced as written. *Id*. A contract is unambiguous, even if inartfully worded or clumsily arranged, when it fairly admits of but one interpretation. *Holmes v Holmes*, 281 Mich App 575, 594; 760 NW2d 300 (2008). Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided. *Woodington v Shokoohi*, 288 Mich App 352, 374; 792 NW2d 63 (2010).

Parol evidence may not be admitted to vary the terms of an unambiguous contract. *Dunn v Bennett*, 303 Mich App 767, 776; 846 NW2d 75 (2013).

> "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). A party may rescind a contract for a substantial breach of contract. *Rosenthal v Triangle Dev Co*, 261 Mich 462, 463; 246 NW 182 (1933). A substantial breach includes a failure to perform a substantial part of the contract or one of its essential terms or where the contract would not have been executed if default regarding a specific provision had been expected or contemplated. *Id*. Every partial failure to comply will not permit the other party to immediately abandon the contract. *Id*. Rather, it must be determined if the breach was material; whether the nonbreaching party obtained the benefit reasonably expected. *Holtzlander v Brownell*, 182 Mich App 716, 722; 453 NW2d 295 (1990).

### 1. BREACH OF CONTRACT – FAILURE TO TIMELY COMPLETE

Plaintiff first alleges that the trial court failed to acknowledge that defendants did not timely complete the project, and but for this failure to complete, the home would have been occupied at the time the foreclosure notice was posted. We note that plaintiff's complaint raised two claims for breach of contract, failure to notify of the foreclosure notice and failure to indemnify. Thus, although the failure to timely complete was mentioned in the fact section of the complaint, it was not presented as a separate breach of contract claim. However, even if plaintiff had properly pleaded this as a basis for breach of contract, the trial court did not err in granting summary disposition.

The home construction contract provided that:

14.   COMMENCEMENT/COMPLETION:   Contractor shall commence with construction of the Residence hereunder on or about March 2, 2011, assuming a Building Permit has been issued . . . and shall proceed diligently to complete the Residence.   Contractor shall not be responsible for any delays to construction caused by Owner or Owner's agents . . . acts of God, weather conditions, soil conditions, strikes, and/or any other matters or conditions beyond Contractor's reasonable control, provided Contractor has acted prudently in the planning and undertaking of the Work.

The Work under this Agreement shall be completed by Builder as expeditiously as reasonably possible so that the Work shall be Substantially Completed within fifteen (15) months after the date hereof (the "Targeted Completion Date").

The agreement also contained a liquidated damages provision.  If defendants did not timely complete, plaintiff as owner was entitled to liquidated damages of $350 per day until the residence was complete.  Douglas Anderson, plaintiff's employee, filed an affidavit that stated that the home should have been substantially completed by June 3, 2012 pursuant to the agreement, but on June 18, 2013, plaintiff's home was still not complete.  Therefore, defendants were still on the worksite at the time the notice of foreclosure was posted.

This affidavit simply concludes that defendants were at fault for failing to timely complete, yet the contract contained numerous events that could delay the project that were not attributable to defendants.  Further, although the home's completion was over a year past the targeted completion date, there was no indication that plaintiff invoked the $350 per day liquidated damages provision.    Additionally, plaintiff's documentary evidence neglected to indicate that the commencement date of March 2, 2011 occurred[4] such that the completion date could be deemed to be calculated at June 3, 2012.  Thus, plaintiff failed to demonstrate defendants breached this term.

More importantly, the party asserting a breach of contract must prove damages with reasonable certainty and may recover only those damages that are the direct, natural, and proximate result of the breach.  *Alan Custom Homes*, 256 Mich App at 512.  Even assuming that defendant Frye removed the foreclosure notice from the residence and did not contact plaintiff and that these actions constituted a breach of contract, plaintiff's damages, the loss of the property to foreclosure, was not the direct, natural, and proximate result of his actions.  The posting of the foreclosure notice was not the sole warning to plaintiff of the failure to pay property taxes.  Rather, plaintiff recorded its address on the deed and presumably was aware of the need to pay taxes.  Yet, plaintiff did not ensure that the address on the deed was correct and updated accordingly.  Our citation to the facts of the foreclosure cases demonstrates that there is an extensive process involved in attempting to provide notice to a homeowner of unpaid taxes.  Although plaintiff's representative Antipov alleged that he did not receive any notices in the mail from the county in the tax foreclosure actions, the Court of Claims found, following a bench trial, that this assertion "was

---

[4] Anderson's affidavit does not address whether the building permit was timely attained such that the commencement date delineated in the contract occurred.

-15-

simply not credible." Moreover, the Court of Claims and this Court found that plaintiff received notice in accordance with MCL 211.78*l*. *2 Crooked Creek, LLC*, ___ Mich App at ___ (Slip op 10-18). This claim for relief fails.

## 2. BREACH OF CONTRACT - FAILURE TO NOTIFY AND INDEMNIFY

Next, plaintiff contends that defendants breached their duty to notify plaintiff of the foreclosure notice posted at the site as well as the indemnification provision. We disagree.

The home construction contract contained the following provisions:

12. SUPERVISION: Owner agrees that the direction and supervision of Contractor's working forces, including subcontractors rests exclusively with Contractor. Owner and Consultant shall be entitled to visit the site at any time and may ask questions, observe, take video or still photographs, or otherwise observe the construction provided they do not unreasonably interfere with the Work. *Contractor agrees to indemnify and hold Owner harmless from and against all claims, damages, losses, and expenses, including reasonable attorneys' fees in the event of a lawsuit, arising out of Contractor's performance of its obligations under this Agreement, which are (i) for bodily injury, illness, or death, or for property damage, including loss of use, and (ii) caused in whole or in part by Contractor's negligence or willful misconduct, or that of a Subcontractor . . . .*

\* \* \*

15. NOTICE: All notices shall be in writing and shall be served by one Party or attorney to the other Party. Notice shall be given in the following manner:

(a) By personal delivery of such Notice; or

(b) By mailing of such Notice to the addresses recited herein by regular mail and by certified mail, return receipt requested. Except as otherwise provided herein, Notice served by certified mail shall be effective on the date of mailing; or

(c) By commercial overnight delivery (e.g., FedEx). Such Notice shall be effective on the next Business Day following deposit with the overnight delivery company. [Emphasis added.]

The trial court properly granted summary disposition of the duty to indemnify and the duty to provide notice of the foreclosure. The plain, unambiguous language of the home construction contract provided that the duty to indemnify arose from the contractor's performance of the contract to build a house ("arising out of Contractor's performance of its obligations under this Agreement"). There is no indication that the contractor agreed to become plaintiff's on-site agent for purposes of addressing the tax consequences of property ownership. Additionally, the notice provision stated that notices were in writing served "by one Party or attorney to the other Party." The language of the contract again contemplates an agreement between plaintiff and defendants for the home construction. In context, it does not contemplate that defendants became the on-site

agent to receive notices from third-parties. Thus, the trial court appropriately dismissed those claims for breach of contract.

## C. NEGLIGENCE

Next, plaintiff submits that the trial court erred in dismissing its negligence claim. We disagree.

To establish a prima facie case of negligence, the burden of proof rests with the plaintiff to show that (1) the defendant owed a legal duty to the plaintiff; (2) the defendant breached the duty; (3) the plaintiff suffered damages; and (4) the defendant's breach was a proximate cause of the damages sustained by the plaintiff. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). Whether a defendant owes a duty presents a question of law for the court. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). When material facts are not in dispute and reasonable minds could not differ, the issue of proximate cause also presents a question of law for the court. *Dawe v Dr Reuven Bar-Levav & Assocs, PC*, 289 Mich App 380, 393; 808 NW2d 240 (2010).

"A plaintiff cannot maintain an action in tort for nonperformance of a contract." *Casey v Auto-Owners Ins Co*, 273 Mich App 388, 401; 729 NW2d 277 (2006). To pursue a tort action separate and distinct from a contractual duty, "the operative question . . . is whether the defendant owed the plaintiff any legal duty that would support a cause of action in tort, including those duties that are imposed by law." *Loweke*, 489 Mich at 171.

With regard to proximate cause, the Court in *Ray v Swager*, 501 Mich 52; 903 NW2d 366 (2017) held:

> Proximate cause is an essential element of a negligence claim. It involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. Proximate cause is distinct from cause in fact, also known as factual causation, which requires showing that but for the defendant's actions, the plaintiff's injury would not have occurred. Courts must not conflate these two concepts. We recognize that our own decisions have not always been perfectly clear on this topic given that we have used proximate cause both as a broader term referring to factual causation and legal causation together and as a narrower term referring only to legal causation. All this broader characterization recognizes, however, is that a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries. In a negligence action, a plaintiff must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff was the general kind of harm the defendant negligently risked. If factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue. [*Ray*, 501 Mich at 63-64 (citations and quotations omitted).]

To establish cause in fact, the plaintiff must present substantial evidence from which the jury may conclude that more likely than not, but for the defendant's action, the plaintiff's injuries would not have occurred. *Patrick v Turkelson*, 322 Mich App 595, 617; 913 NW2d 369 (2018).

In *Skinner v Square D Co*, 445 Mich 153, 165-166; 516 NW2d 475 (1994), the Court delineated the threshold evidentiary standard necessary for a plaintiff to prove factual causation in negligence cases:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

> The mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two.

> There must be substantial evidence which forms a reasonable basis for the inference of negligence. There must be more than a mere possibility that unreasonable conduct of the defendant caused the injury. We cannot permit the jury to guess . . . .

The trial court granted summary disposition by concluding that defendants owed no common law duty either to leave the posted notice in place or to inform plaintiff of the posted notice. Caselaw holds that at common law,

> [a]ctionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law. The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others. This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another. [*Clark v Dalman*, 379 Mich 251, 260-261; 150 NW2d 755 (1967).]

In light of the fact that defendants' obligations arose from the contract, we decline to impose a common law duty in negligence. As noted by our citation to the foreclosure cases, there is an extensive process involved in notifying a homeowner of unpaid taxes to prevent foreclosure. Plaintiff, as an out of state resident, could have contracted with defendants to become an on-site agent to monitor the property, but did not.

Further, the proofs to establish proximate cause are lacking. *Ray*, 501 Mich at 63-64. That is, to establish cause in fact, plaintiff had to present substantial evidence that more likely than not, but for the defendants' action, its injuries would not have occurred. *Patrick*, 322 Mich App at 617.

-18-

It cannot be concluded that any removal of the notice by Frye was the "but for" cause of the foreclosure in light of the notice procedure that was followed by the county. Accordingly, plaintiff's claim of negligence failed.

## D. ABUSE OF PROCESS

Plaintiff claims that the trial court improperly dismissed the claim for abuse of process. We disagree.

In *Lawrence v Burdi*, 314 Mich App 203, 211-212; 886 NW2d 748 (2016), this Court discussed abuse of process:

> "Abuse of process is the wrongful use of the process of a court." *Spear v Pendill*, 164 Mich 620, 623; 130 NW 343 (1922). "This action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Id*. at 623 (quotation marks and citation omitted). "To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v Dozorc*, 412 Mich 1, 30, 312 NW2d 585 (1981). Expanding on each of the elements, the *Friedman* Court went on to explain that the act must be something more than just the initiation of a lawsuit, and the ulterior purpose has to be something other than settling a suit. *Id*. at 31. Justice Cooley, in his treatise on torts, stated, "One way in which process is sometimes abuse, is by making use of it to accomplish not the ostensible purpose for which it is taken out, but some other purpose for which it is an illegitimate and unlawful means." Cooley, The Law of Torts or the Wrongs which Arise Independently of Contract (3d ed), p 356.

"A meritorious claim of abuse of process contemplates a situation where the defendant has availed himself of a proper legal procedure for a purpose collateral to the intended use of that procedure, e.g., where the defendant utilizes discovery in a manner consistent with the rules of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms." *Vallance v Brewbaker*, 161 Mich App 642, 646; 411 NW2d 808 (1987). Liability is imposed for the misuse of process, no matter whether properly obtained, for any purpose other than that which it was designed to accomplish. *Friedman*, 412 Mich at 30, n 18.

The trial court correctly granted summary disposition of this claim. Defendants and the affiants did not pursue the tax foreclosure action involving plaintiff. Rather, the county foreclosed upon the property, and plaintiff and the county were the litigants in the foreclosure proceeding. Although plaintiff contends that defendants benefitted from the foreclosure because the county promised to pay defendants any outstanding contractual balance, evidentiary support for that assertion was not presented. Moreover, the content of the affidavits, whether true or false, did not negate the other forms of notice that were provided by the county to plaintiff and that were upheld by the trial court and this Court as comporting with due process and MCL 211.78*l*. Plaintiff's attempt to hold defendants responsible fails.

## VI.  RECONSIDERATION

Plaintiff contends that the trial court improperly denied the motion for reconsideration.  We disagree.

The trial court's decision to grant or deny a motion for reconsideration is reviewed for an abuse of discretion.  See *Frankenmuth Ins Co v Poll*, 311 Mich App 442, 448; 875 NW2d 250 (2015).  An abuse of discretion occurs when the trial court's decisions falls outside the range of reasonable and principled outcomes.  *Yoost v Caspari*, 295 Mich App 209, 219-220; 813 NW2d 783 (2012).  The trial court granted summary disposition.  Because the trial court retired, a successor judge ruled on the reconsideration motion and found that the same issues were presented.  The successor judge failed to identify any legal errors committed and affirmed the summary disposition decision.  The trial court did not abuse its discretion.

## VII.  DISCOVERY

Plaintiff contends that the trial court erred in failing to grant an adjournment to allow it to engage in additional discovery.  We disagree.

The trial court's decision to deny an adjournment is reviewed for an abuse of discretion. *Miller Bros v Dept of Natural Resources*, 203 Mich App 674, 691; 513 NW2d 217 (1994).  In *Meisner Law Group PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 724; 909 NW2d 890 (2017), this Court stated:

> In general, summary disposition is premature if granted before discovery on a disputed issue is complete.  But a party must show that further discovery presents a fair likelihood of uncovering factual support for the party's position.  Indeed, a party claiming that summary disposition is premature must identify a disputed issue and support that issue with independent evidence. [Citations and punctuation omitted).]

Plaintiff proffered that it needed to engage in additional discovery to address why defendant Frye removed the notice and precisely what he did with the notice and with whom he communicated.  However, as noted, plaintiff failed to demonstrate that but for the removal of the notice, the property would not have been foreclosed upon.  This case was resolved on questions of law pertaining to duty.  Therefore, the trial court did not abuse its discretion in ruling on the summary disposition motion prior to the close of discovery and by denying the request for an adjournment.

Affirmed.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly